**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ELSHEIKH M. HASSAN | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-3711 |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| NORTHWESTERN HUMAN SERVICES | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ORDER

And now, this _____ day of _____, 2006 upon consideration of Defendant Northwest Human Services Motion to Dismiss Plaintiff's Complaint and the response thereto by Plaintiff Elsheik M. Hassan, GOOD CAUSE being shown, Defendant's Motion is **DENIED.**

_____
                                                                                        J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ELSHEIKH M. HASSAN | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-3711 |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| NORTHWESTERN HUMAN | ) | |
| SERVICES | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF ELSHEIKH  HASSAN'S RESPONSE IN OPPOSITION TO
DEFENDANT NORTHWEST HUMAN SERVICES' MOTION TO  DISMISS
PLAINTIFF'S  COMPLAINT**

Plaintiff  Elsheikh Hassan  ("Hassan"), by and through his undersigned counsel of record,

files this brief in opposition to Defendant Northwest Human Services ("NHS").

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

NHS has failed to follow the basic rules of a demurrer, which require that the moving

party accept as true the well-pleaded facts of the complaint.   NHS invites the Court to construe

this complaint in NHS's favor.  Under the liberal rules of notice pleading, Plaintiff has

adequately pled claims for discrimination based upon his national origin, religion and ethnicity

and this motion must be denied.[1]

**I.      STANDARD OF REVIEW**

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the

legal sufficiency of the complaint.  *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d

---

[1]Plaintiff makes no class action claims in the Complaint. Reference to claims on behalf of
similarly situated class members appears only in the introductory language of the Complaint.  It is an
artifact from another Complaint in another matter.  To the extent that there appears to be a class action
pled, Plaintiff withdraws that claim.

80 (1957).  The motion may be granted only where "it appears beyond a reasonable doubt that the plaintiff can prove **no set of facts** in support of his claim that would entitle him to relief." *Carino v. Stefan,* 376 F.3d8 156, 159 (3d Cir.2004) (quoting *Conley,* 355 U.S. at 45-46) (emphasis supplied).  Stated another way, the court may grant the motion only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, the plaintiff is not entitled to relief.  *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 183 (3d Cir.2000).

When considering a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6), the court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *Carino,* 376 F.3d at 159. *See also D.P. Enters. v. Bucks County Cmty. Coll.,* 725 F.2d 943, 944 (3d Cir.1984); *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1164-65 (3d Cir.1987).

Plaintiff is not required to plead in detail all of the facts upon which he bases his claim. *Conley,* 355 U.S. at 47.  F.R. Civ. P. 8(a)(2) articulates the liberal notice pleading requirements in the federal courts.  It requires only that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief...." sufficient to give defendant fair notice of plaintiff's claim and the grounds upon which it rests.  *Conley,* 355 U.S. at 47.   Nor is plaintiff required to plead every element of a *prima facie* case to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510-12, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).  He must only allege material facts that, "in addition to inferences drawn from those [factual]

allegations, provide a basis for recovery." *Menkowitz v. Pottstown Mem'l Med. Ctr.,* 154 F.3d 113, 124 (3d Cir.1998).[2]

"The issue, therefore, is not whether the Plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claims." *Brown v. Murphy,* 2006 WL 495381, 1 (E.D.Pa.2006), citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and *Maio v. Aetna, Inc.,* 221 F.3d 472, 482 (3d Cir.2000). Accordingly, "a court should not grant a motion to dismiss 'unless it appears beyond a doubt that the plaintiff can prove **no set of facts** in support of his claim which would entitle him to relief." ' *Conley,* 355 U.S. at 45-46; *Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Kaniuka v. Good Shepherd Home,* 2005 WL 2994348, *2 (E.D.Pa.,2005).

Thus, Defendant's substantive explanations for its conduct are irrelevant at this stage of the case, where the court is required to take all inferences in favor of the Plaintiff. "Whether there was some other, legitimate motive is a disputed issue of material fact, to be

---

[2] NHS' lengthy footnote 6, on page 8 of its Memorandum, utterly ignores these well-settled rule. Although it agrees that the ordinary pleadings rules apply to discrimination claims, NHS goes on to state that Hassan's brief is inadequate because he does not meet the standard for stating a **defamation** claim. *Savage v. Conn. Gen.Life Ins.,* 1996 WL 434288 *3 (1996). In Savage the court held an pleading inadequate where the plaintiff had not stated the substance or "identified the speaker or the recipient of the allegedly defamatory statement, or the date or place thereof." The court did **not**, as NHS alleges merely "grant defendant's motion to dismiss for lack of specificity." (NHS brief at p. 8, fn.9). Rather, Judge Reed altered his consideration to a motion under Fed.R.Civ.P. 12(e) for a more definite statement, and granted that motion without prejudice to plaintiff filing an amended complaint. Id. at *3. NHS likewise mischaracterizes the holding in *Jaffe v. Snider,* 1995 WL 519651, *1 (E.D.Pa.,1995). There, plaintiff had already been instructed to amend her complaint to state more than conclusory allegations and instead "assert[ed] that the discontinuance of benefits constitutes cruel and unusual punishment." She had thus failed after a Rule 12(e) order which directed her to "enumerate what specific actions or inactions by defendant caused harm to her, the dates on which such events occurred, what actual harm plaintiff suffered as a result of defendant's actions or inactions, and exactly what relief plaintiff was seeking." *Id.* By contrast, Plaintiff's Compliant falls well within the requirements of notice pleading. He states a period during which he repeatedly sought and was promised work and identifies individuals who were involved in denying it. Requiring more prior to discovery would be onerous.

resolved at later stages of this litigation." *Welsh v. Stern,* 2006 WL 166509 *11(E.D.

Pa.1/19/2006).

## II.    FACTS IN THE COMPLAINT AND REASONABLE INFERENCES IN PLAINTIFF'S FAVOR THEREFROM.

As noted above, the court is limited to accepting as true the facts pleaded in the

Complaint and reasonable inferences therefrom *in Plaintiff's favor.*    At this stage in the

proceedings, Plaintiff is entitled to plead inconsistent and even contradictory facts without fear of

dismissal, so long as there is some basis for recovery.  Construing the allegations of the

Complaint in the light most favorable to Plaintiff and drawing all reasonable inferences to aid the

pleader - and recognizing that Plaintiff is entitled to plead both facts and claims in the alternative

under F.R.C.P. 8(e)(2) - the following relevant facts are presently before the Court:

Hassan was born in Africa and has a discernable accent. Complaint at ¶ 7 (hereinafter

cited by ¶ sign).   Hassan is a practicing Muslim whose religion was known to Defendants, as he

regularly took breaks to pray during such events as day-long training or evening supervision. ¶ 8

Hassan is a legal resident in the United States and was eligible for employment under all relevant

state and federal laws. ¶ 9

In or around February 2000, Hassan began working as a Therapeutic Staff Support

Counselor (TSS) for NHS at its 1300 West Lehigh Avenue, Philadelphia location. ¶ 10 As a TSS

Counselor, Hassan implemented and supervised individualized behavior modification treatment

plans for each child/adolescent he was assigned. ¶ 11 He did so in the homes of his assigned

clients under the supervision of a Behavioral Services Consultant.  ¶ 12  From the time he was

hired in 2000, and up until September 2004, Hassan worked evenings and/or weekends totaling

up to 40 hours a week,  without incident or performance related problems.  ¶ 13  Shortly after

Hassan was hired, he was given an assignment to one particular client (J.W.) with whom he

worked until September 2004.  In 2000 and 2001 he also received other shorter term assignments, but remained primarily assigned to J.W. ¶ 14  Hassan was never assigned another client other than JW, even though JW's authorization was reduced. ¶ 15

In January 2003, Defendant NHS hired Rhonda Matlack (white/non-African born) as Program Director of the Behavioral Health Program. ¶ 16  In June 2004, Hassan lost his weekday/daytime job and placed several requests, both orally and in writing, to NHS for additional hours.  Hassan advised NHS he was available days, evenings and weekends. ¶ 17 It is Hassan's understanding that Rhonda Matlack was the individual who made the final decision as to who would be assigned what case. ¶ 18  Despite Hassans repeated requests, he was never given another assignment. ¶ 19

In September 2004, Hassan's client was moved. ¶ 20  At the direction of his case manager, Hassan contacted Rhonda Matlack and was instructed to submit a form "Request for Hours," which Hassan did.  Matlack then advised him he would be contacted with a new assignment. ¶ 21 Hassan continued to follow-up on his request for new assignments.  At some point ***soon thereafter,*** NHS told Hassan that he was being given another assignment.  When the assignment failed to materialize, Hassan inquired into it and was told that "*it wouldn't work*" without any further explanation. ¶ 22  The assignment referred to in Paragraph 21 was eventually assigned to a non-African employee. ¶ 23

After several weeks, when Hassan did not receive any further contact from NHS regarding a new assignment, he once again contacted NHS to ask if any new assignments were available.  Each time NHS told Hassan there were no available assignments for him. ¶ 24 Throughout the remainder of 2004 and into 2005, Hassan periodically continued to contact NHS and request whether there were any new assignments available; he made sure to keep NHS

advised of his address. ¶ 25  Each time Hassan was advised that there were none and that NHS would contact him if one became available.  ¶ 26   Finally, after being told once again in June 2005 that there were no available assignments, Hassan applied for Unemployment Compensation. ¶ 27

At no time from September 2004 and up until June 2005, when Hassan applied for Unemployment, did NHS ever attempt to contact him with offers of work or any new assignments. ¶ 28  Upon receipt of the notice that Hassan had filed for Unemployment, NHS responded by falsely alleging that Hassan had voluntarily quit when work was available. ¶ 29 The Unemployment Compensation Bureau denied Hassan's clam based on the response it received from NHS. ¶ 30  Hassan filed an Appeal with the Unemployment Compensation Appeals Board of Review. ¶ 31  At the Appeal hearing, NHS appeared via a contracted representative.[3]  ¶ 32.  Hassan appeared as well.  ¶ 32  The Appeal Board determined that Hassan had, in fact, not quit his employment with NHS, but was in effect laid-off as NHS had not offered any work to Hassan once his assignment ended in September 2004. ¶ 33

From the time his last his assignment ended in September 2004 and until June 2005, he repeatedly requested new assignments from Rhonda Matlack and other NHS managers and was assured they would come to him, until finally Hassan applied for Unemployment Benefits to which NHS attempted to deny him. ¶ 34  NHS's attempt to deny him Unemployment Benefits was based upon NHS's discriminatory animus towards him because of his national origin and religion. ¶ 35

_____

[3] NHS falsely asserts that the Complaint supports its allegation that it did not oppose Hassan's appeal from the denial of Unemployment Compensation benefits.  The complaint clearly states that NHS opposed them at both the initial level and at the appeal from the initial denial.

Fom the time Hassan was hired until approximately February 2003, there were at least 15 or more African-born TSS in the Wrap Around Program in which he worked who were working for NHS. ¶ 36  Beginning in or about early 2003, after Rhonda Matlack was placed in the position of Regional Manager.  ¶ 37  NHS wrongly asserts that Hassan's allegations regarding other employees are an "attempt to plead around the statutory bar."  As demonstrated below, these allegations - if proved true - constitute evidence discriminatory bias which is admissible whatever the statutory bar, and demonstrate a pattern and practice of discriminatory actions by NHS which created a hostile working environment, which is likewise admissible.  NHS also wrongly asserts that Hassan has "admitted understanding of the purportedly discriminatory treatment being suffered by African born TSS workers from February 2003 onward."  NHS is not entitled to draw inferences in its favor on a Motion to Dismiss. His Complaint does not allege that he was aware of the discrimination from the start of 2003.  Rather, it asserts that Matlack was hired in or around early 2003 and that she began a process that resulted - over time - in the termination of most African-born employees. ¶ 37

During the period that he was denied employment, work was available at NHS for which he was qualified,  but was assigned to other non-African-born employees.¶ 38[4] Although there were African-born employees requesting work for which they were qualified, including Hassaan, NHS continued to hire other non-African born employees rather than assign the available work to the African-born employees already employed at NHS. ¶ 39   In further support of his allegations of discriminatory animus at NHS, Plaintiff alleges that, starting in early 2003 and forward, NHS

---

[4] Bafflingly, NHS asserts that Plaintiff does not allege that non-African or non-Muslim employees were "consistently being assigned more than 40 hours a week" but rather that he suggests NHS discriminated against him by failing to suspend its hiring of employees to ensure "that he worked more than forty hours per week." NHS Brief at p. 10, fn.7.  There is no foundation in the Complaint for this assertion, nor can it be reasonably inferred from the Complaint.

engaged in a pattern and practice of selectively terminating African-born employees including

failing to assign work to this class of employees. ¶ 40.   The effect of this pattern and practice of

discrimination was to remove all but a few  African-born employees from employment within

NHS. ¶ 41

Plaintiff raises claims for religious and national origin discrimination Title VII (Count I),

§ 1981 (Count II) and the PHRA.  All of these claim are adequately supported by the pleadings.

To the extent the court believes that they are not, plaintiff seeks leave to amend to state

additional facts consistent with the complaint which will meet all of Defendant's challenges.

## III.   LEGAL ARGUMENT

### A.   Plaintiff's EEOC Charge Claim Was Timely Filed within 300 days of his Becoming aware of NHS' last Act of Discrimination. [5]

#### 1.   Plaintiff was not the victim of discrimination merely because his client had moved; the discrimination was the *subsequent* failure to assign a new client when Plaintiff was qualified, available, "on the books" and had been promised such an assignment.

The court may reasonably infer from this Complaint that Plaintiff was unaware that he

had been "terminated" from employment with NHS for many months.  He was aware that his

client had ceased to need services, but he was promised that another would be assigned.   NHS

can not reasonably contend that Hassan should have filed a discrimination charge on **the day** his

client stopped needing services.  He was promised another assignment and had no reason to

doubt that promise, as his performance had clearly been "good enough" to allow him to complete

---

[5]   The PHRA is co-extensive in its coverage with Title VII and is subject to the same the same analysis as cases under Title VII.  *Goosby v. Johnson & Johnson Medical, Inc.,* 228 F.3d 313, 317 fn. 3(3d Cir. 2000).   It is therefore not separately addressed herein.  Also not addressed herein is the assertion that because the word "religion" does not appear in the title of the Title VII and PHRA counts, Defendant is not on notice under the liberal rules of federal pleading that Plaintiff seeks to raise claims of religious discrimination.  This is a frivolous argument.  NHS was on enough "notice" to seek to have the religion claims dismissed.  Plaintiff can obviously amend to meet this challenge and seeks leave to do so should the Court find it necessary.

the assignment.  Several weeks later, Hassan was promised that another assignment was in the works.  Clearly, there was no basis then for him to understand that he was the victim of discrimination.

Because Hassan was repeatedly assured that there was another assignment on its way, and there was no discrete act of termination but just the apparently slow workings of a bureaucracy, there was no reason for Hassan to know he had suffered an adverse action.  Indeed, it was not until he applied for unemployment compensation that Hassan knew that NHS did not intend to provide him more assignments and asserted that he had quit.

There is clearly a point at which Hassan should reasonably have been on notice of his termination, which point will be discerned in discovery or established by a jury.  Where the employer makes no overt statement of termination, however, and leads the employee to believe that he has not been terminated by promising more work, the employee should not be charged with immediate knowledge of his termination.  Construing the facts in the light most favorable to Plaintiff, his awareness of the discrimination is reasonably deferred for at least 8 weeks – bringing his charge filed less than 12 months after termination well within the 300 day statutory limitation period.

Under *Cowell v. Palmer Township,* there are three factors relevant to analyzing a continuing violation claim: (1) subject matter-whether the violations constitute the same type of discrimination , tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) **degree of permanence-whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert** his rights.  263 F.3d 286 (3d Cir.2001) (as described in *Thorpe v. Grillo*  80 Fed.Appx. 215, 220, 2003 WL 22477890, *4 (3d Cir. 2003)).  The mere loss of a client is not an

event with "a degree of permanence" which should trigger plaintiff's awareness of and duty to assert his rights.

Each of the cases upon which NHS relies for immediate notice to plaintiff of the discrimination involved a failure to promote. See, *Morgan,* 536 U.S. at 113, *Rush,* 113 F. 3d at 483, *and Ryan v. General Mach. Prods.* 2003 WL 21982194 (E.D. Pa. 9/21/03). Failure to promote, like termination, is a discrete event which occurs on a specific date. Despite NHS' efforts to characterize its own conduct as termination of Hassan in September of 2004, it cannot avoid the fact that Hassan had merely lost a client and was promised continued work. Nor can it avoid the very damning allegation that it falsely advised unemployment that he had quit. These allegations must be accepted as true at this stage in the proceedings. Taken together, they show an employer who is unfairly unclear to the employee regarding his status and then asserts that the employee should have known that the employer was lying when it promised more work. Alternatively, NHS may have itself been confused as to Hassan's status. If that's the case, it can hardly be heard to complain that Hassan was likewise confused.

Plaintiff's case here is clearly different from the "discrete discriminatory acts" of discrimination described in *Nat'l RR Passenger Corp v. Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061 (2002) such as notice of termination or failure to promote. At worst, Plaintiff was intentionally misled to believe that he was going to be given another assignment, which would give rise to equitable tolling. See, *Williams v. Rohm and Haas Co.* 90 Fed.Appx. 627, 628, 2004 WL 234966, *1 (3d Cir. 2004). At best, NHS did intend to provide him a new assignment for quite some time, and only decided not to as late as the date on which he applied for unemployment (which was clearly within the statutory time frame).

"[R]unning throughout the equitable estoppel cases is the obligation of the plaintiff to exercise due diligence to preserve his or her claim." *Robinson v. Dalton,* 107 F.3d 1018, 1023 (3d Cir.1997); cited with approval in P*odobnik v. U.S. Postal Service,* 409 F.3d 584, 592 (#3d Cir. 2005). Here, plaintiff filed his charge within 300 days of a mere 8 weeks after he lost his client. NHS concedes that Hassan has no reason to believe that the loss of a client was discriminatory. NHS Brief at p. 4. It was the failure to assign a new patient – which the court may infer Hassan knew could not reasonably happen immediately – that was the discriminatory act. When that occurred, and when it should reasonably have been known to Hassan, is a fact specific question about which Plaintiff is entitled to seek discovery.

As NHS states, a claim accrues upon "awareness of actual injury" – when Plaintiff knew or should have known of the injury. NHS Brief at p. 14. Citing *New Castle County v. Halliburton NUS Corp.,* 111 F. 3d 1116, 1124 (3d Cir. 1997). NHS then continues to discuss Hassan's "termination" when there is **no basis for believing that Hassan was terminated in September 2004.** Indeed, NHS previously stated that Hassan quit. Nor is a few months' patience, in the face of an employers assurance that the employee has not been terminated and will be given another assignment, comparable to the "periodic demands for reinstatement" which are the basis for many of the cases NHS cites. NHS Brief at p. 12. Hassan could not and did not ever demand reinstatement. He had no idea he'd been terminated.

      2.    **NHS' opposition to Hassan's application for unemployment can be introduced as evidence of discrimination if NHS treated others outside the protected class differently.**

NHS urges in a footnote that its opposition to the unemployment compensation claim cannot be the basis for a claim of discrimination. NHS Brief at p. 10 fn. 8. It does so in order to avoid the implication that this act, which occurred within the statutory time frame, could be the

"last act of discrimination." It urges that such a claim is meritless because "NHS simply exercised its legal rights under the law and Plaintiff succeeded on his claim." *Id.* In fact, however, the assertion of otherwise lawful claims for unlawful purposes can be the basis for an independent cause of action and thus can clearly be evidence of discriminatory intent.

In order to state a claim for abuse of process, the plaintiff must allege that the defendant: (1) used a legal process against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff. *Walsh v. Stern* 2006 WL 166509 (Baylson, J)(1/19/06) (citing *Douris v. County of Bucks,* 2001 WL 767579, at *10 (E.D.Pa. July 3, 2001); *Gen. Refractories Co. v. Liberty Mut. Ins. Co.,* No. Civ. A 97-7494, 1999 WL 1134530, at *4 (E.D.Pa. Dec.9, 1999)). "The gist of an action for abuse of process is the improper use of process . . . for some unlawful object, not the purpose which it is intended by the law to effect; in other words, a perversion of it...." *McGee v. Feege,* 517 Pa. 247, 535 A.2d 1020, 1023 (Pa.1987).

Even mere of threats of prosecution, without tangible action, is sufficient to establish the cause of action for Rule 12 purposes, where the warnings were threats for an improper purpose. *Walsh,* 2006 WL 166509, *1. Thus, if NHS's opposition to Hassan's application for unemployment benefits was a manifestation of discrimination (if for example, non-African employees' applications are not opposed), it is sufficient under the law to satisfy the elements of an abuse of process claim. See, *Hart v. O'Malley,* 436 Pa. Super. 151, 647 A.2d 542, 551-52 (Pa. Super.1994)(improper purpose renders lawful process abusive).

Moreover, NHS's pronouncements regarding its allegedly legitimate reasons for opposing unemployment are irrelevant at this stage of the proceedings, when all reasonable inferences in Plaintiff's favor must be indulged. "Whether there was some other, legitimate motive is a

-13-

disputed issue of material fact, to be resolved at later stages of this litigation. Given that we can only dismiss a claim if no set of facts consistent with the allegations would give rise to relief, it is not appropriate to dismiss the abuse of process claim at the 12(b)(6) stage. *Walsh,* 2006 WL 166509 at *2.

NHS's citation to *Glanzman v. Metropolitan Management Corporation,* 391 F. 3d 506, 516 (3d Cir. 2004) is out of context. That case arose from a review of a the trial court's grant of summary judgment. After affirming the decision that the employer had more than adequately proved legitimate non-discriminatory reasons for Plaintiff's termination, the court turned to allegations that the employer retaliated against an employee **because she filed an unemployment compensation claim** and did so by opposing the unemployment compensation claim. The court noted that Plaintiff "could not suffer adverse employment action after or contemporaneous with the protected activity. Quite obviously, given the nature of unemployment benefits, her employment was terminated before, not after or contemporaneous with, her filing for unemployment compensation. Once her employment was terminated it was not possible for her to suffer adverse employment action."

That language in *Glanzman* is clearly *dicta,* and is inconsistent with decisions of the 3d Circuit establishing that what constitutes adverse action depends upon the situation and that there need not be any monetary cost involved. Thus, the Third Circuit stated a year after *Glanzman* that even denial of a second level appeal to which an employee has no right can be the basis of a claim of retaliation. *Fassold v. Justice,* 409 F. 3d 178, 189 (3d Cir. 2005) citing *Hishon v. King & Spalding,* 467 U.S. 69, 75, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)(any benefit provided to employees must be administered without discrimination).

-14-

What constitutes retaliation depends on what a person in the plaintiff's position would reasonably understand and can include, for example, lateral transfer, with no change in pay. *Dilenno v. Goodwill Industries of Mid-Eastern Pennsylvania,* 162 F.3d 235, 236 (3d Cir. 1998). And see, *Serrano-Cruz v. DFI Puerto Rico, Inc.,* 109 F.3d 23, 26 (1st Cir.1997) (setting an employee up to fail can be adverse action); *Bernheim v. Litt,* 79 F.3d 318, 325 (2d Cir.1996) (reassignment to a job requiring a five-story climb could be retaliatory if the employer knew of the employee's difficulty climbing stairs); *cf. Schafer v. Board of Public Education,* 903 F.2d 243 (3d Cir.1990) (holding that, when the school board knew that the plaintiff would quit if denied paternity leave, the denial constituted a constructive discharge). Even an alteration in job responsibilities can constitute an adverse employment action *Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 (3d Cir.1993); *Bearley v. Friendly Ice Cream Corp.* 322 F.Supp.2d 563, 577 (M.D.Pa. 2004).

Plaintiff does not dispute that, because they are addressed to different issues, the **findings** of the Unemployment Compensation Board are not binding in a discrimination claim. However, statements against interest of a party opponent are admissible under the Rules of Evidence, Rule 803. NHS' assertion that Hassan quit is admissible as a statement of a party opponent which it will have an opportunity to explain, but not here. For the purposes of a Motion to Dismiss under Rule 12, it must be construed as an intentional act of discrimination by an employer who was fully aware the Hassan did not quit and who does not oppose claims by other employees.

**B.    Plaintiff Has Adequately Stated a Claim Under § 1981, which Prohibits Discrimination based Upon Ethnicity.**

NHS ignores binding 1987 Supreme Court precedent to reply upon a decision from a prior decade,  *Martinez v. Bethlehem Steel Corp,* [78 F.R.D. 125 (E.D.Pa. 1978)] for the assertion that an African immigrant to the US does not fall within the protections of § 1981.  Although NHS advises the court to "see also" the lead Supreme Court decision on this point, *St. Francis College v. Al-Khazraji*, it fails to note that the decision in *St. Francis* directly contradicts *Martinez*.  In fact,  *St. Francis* mandates that this claim proceed.  481 U.S. 604, 614, 107 S. Ct. 2022, 208 (1987).

 In *St. Francis*, the Supreme Court stated that the protection of § 1981 is to be broadly construed,  to protect from discriminatory animus "the kind of group that Congress intended to protect when it passed the statute."  481 U.S. at 613.   The Supreme Court held that § 1981 applies to more than racial bias; it reaches discrimination based on "ancestry or ethnic characteristics."  481 U.S. at 614, 107 S.Ct. at 2028 (1987).

Specifically, in *St. Francis,* the Court held that § 1981 barred intentional discrimination based on the fact that Plaintiff was "***born an Arab***."  481 U.S. at 613, 107 S. Ct. at 2028.  The Court reached this conclusion despite the fact that plaintiff and defendants could be classified as members of the "Caucasian" race, and despite the fact that the pleadings stated that the discrimination alleged was based upon the plaintiff's Iranian nationality.  *Id.*  Accord, *Share Tefila Congregation v. Cobb,* (American and European-born Jews are protected from discrimination based upon their ethnic and cultural identification as Jews).  481 U.S. 615, 107 S.Ct. 2019 (1987).

-16-

The Supreme Court reached this broad construction of § 1981 by reviewing its legislative history. *St. Francis*, 481 U.S. at 609.  The Congress that passed §1981 in 1866 was passionate about protecting not just the "black" or "African race" from discrimination but myriad other "races" including, *inter alia,* Arab,  English, Finnish, Chinese, Gypsy, Basque, Hebrew, Swedish, Mongolian, Norwegian, Greek, Mexican and Italian.  481 U.S. at 611-12 (citing  Cong.Globe, 39th Cong., 1st Sess. 1866).

> "Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination **identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.**  Such discrimination is [the] racial discrimination that Congress intended §1981 to forbid, whether of not it would be classified as racial in terms of modern scientific theory. . . . **A distinctive physiognomy is not essential to qualify for § 1981 protection**."

481 U.S. at 613, 107 S. Ct. at 2028 (emphasis supplied).

The logic of *St. Francis ,* and its application here, is inescapable.  NHS does not dispute that Plaintiff was born in north Africa and that immigrated to this country as an adult, that he has a distinctive accent and that he practices a religion common to his ethnicity.  Whether this makes Plaintiff Arabic or African (or possibly both) is a question of perspective.  Plaintiff is, however, is identifiably foreign in both culture and ethnicity and seeks to proceed for discrimination based upon those attributes.  That is clearly a claim under § 1981.

Where the pleadings make clear that plaintiff's ethnic identity and geographic origin are identical as a factual matter, and plaintiff alleges discrimination on ancestry and ethnicity, he has made out a discrimination claim under § 1981.  *Cuello-Suarez v. Autoridad De Energia Electrica De Puerto Rico,* 737 F. Supp. 1243 (D. P. R. 1990).   Accord,  *Gutman v. Tico,* 1998 WL 306502 (E.D.Pa) (membership in protected category based on self-description as "Jew of Russian ancestry" and foreign speech pattern shown in transcript); *Rumala v. New York City Transit*

*Auth.,* 2005 WL 20276596 *9 (E.D.N.Y.) (national origin claim based on accent and ethnicity

may proceed under §1981); *Zucherstein v. Argonne Nat'l Labs*, 948 F. 2d 1467, 1472 (7th Cir.

1993).

     The *dicta* in *Martinez* that Hispanics are not a protected class under §1981, upon which

NHS bases its entire argument, is simply not valid.  See, *Anjelino v. New York Times Co.*, 200

F.3d 73, 98 (3d Cir. 1999)(analysis presumes protection for Hispanics under §1981). The

*Martinez* decision  is founded on the proposition that civil rights statutes should be narrowly

construed.  78 F.R.D. at 127-8.  This proposition has been soundly repudiated; binding precedent

mandates that anti-discrimination statutes be interpreted liberally.  *Rabzak v. County of Berks,*

815 F. 2d 17 (3d Cir. 1987);  *Slagle v. County of Clarion,* 435 F.3d 262, 267 (3d Cir. 2006).

     NHS' reliance upon *Schouten v. CSX Transportation Inc.,* is likewise misplaced.  In that

case, the court was asked to recognize **two separated claims under § 1981: one for ethnicity**

**and one for national origin, standing alone.**  The language of the court in *Schouten* merely

reiterates the observation of Supreme Court Justice Brennan in *St. Francis*, who noted that

national origin **alone** is not protected (thus, for example, a Caucasian American born while his

parents were on vacation in Africa could not raise a claim based upon national origin), but where

it is associated with ethnicity and culture, national origin is the "racial" category that § 1981 was

intended to protect.:

> "**In St. Francis College, the Supreme Court held that, for purposes of § 1981,
> race is to be interpreted broadly and may encompass ancestry or ethnic
> characteristics.**  481 U.S. at 613, 107 S.Ct. 2022. . . . A claim alleging
> discrimination based upon national origin **alone** (which cannot be understood as a
> claim for race discrimination) must fail as such is not cognizable under § 1981.

*Schouten v. CSX Transp., Inc.*  58 F. Supp.2d 614, 618 (E.D.Pa. 1999)(emphasis supplied).

For the same reason, NHS's reliance upon *Beaubran v. Inter Cultural Family,* 2006 WL 1997371 (E.D. Pa. July 13, 2006) is misplaced.  Like the decision in *Schouten*, the decision in *Beaubran* focused upon an individual who alleged that she suffered discrimination due to the **place of her birth**.  In *Beaubran* Court acknowledged that "There appears to be a split of authority within the Third Circuit on the issue of whether section 1981 provides a cause of action for discrimination based **solely** on a person's national origin" where the Third Circuit itself has not directly addressed this issue.   2006 WL 1997371, *4 -5 (comparing, *Abdulhay v. Bethlehem Med. Arts, L.P.,* Civ. A. No. 03-0447, 2004 WL 620127, at *5 n. 35 (E.D.Pa. March 29, 2004) (Gardner, J., holding  "[d]iscrimination on the basis of national origin, ethnicity and ancestry clearly fall within the realm of § 1981." 2004 WL 620127at *5*; Wallace v. Graphic Mgmt. Assocs., Inc.*, Civ. A. No. 04-0819, 2005 WL 527112, at *3 (E.D.Pa. March 3, 2005) (holding that while "§ 1981 does not prohibit discrimination based on national origin," pro se plaintiff's complaint could be read to allege a section 1981 claim based on race, ethnicity, and ancestry) and *Fekade v. Lincoln Univ.*, 167 F. Supp.2d 731, 739 (E .D. Pa.2001) (agreeing with plaintiff's concession that section 1981 "was not drafted in terms of national origin, and thus [plaintiff's] claim of national origin discrimination cannot be founded on a violation of this statute"); *King v. Township of East Lampeter,* 17 F. Supp.2d 394, 417 (E.D.Pa.1998) ("The scope of [section] 1981 is not so broad as to include disparity in treatment on the basis of religion, sex, or national origin").

Plaintiff does not allege that he suffered discrimination based upon the mere happenstance of his birth in an African country; rather, he alleges precisely the sort of ethnic, cultural discrimination intended to be prohibited by §1981.  He is identifiably ethnically African, speaks with an accent and practices a religion common to his ethnic origins.  Just as in *St.*

*Francis* discrimination against an Iranian because he was "**born an Arab**" is prohibited, so too discrimination against Plaintiff because he was **"born ethnically African"** is prohibited under §1981.

> **C.**    **Because Evidence of Acts Outside the Relevant Limitations Period is *per se* Admissible in a Discrimination Case, Allegations about Those Events Cannot Form the Basis for Dismissal of a Complaint Which Also Alleges Acts Within the Relevant Time Frame.**

Defendant's reliance upon *National R.R. Passenger Corp. v. Morgan*, is baffling. *National R.R. Passenger Corp. v. Morgan* 536 U.S. 101, 122 S.Ct. 2061 (2002). That case examined both whether **evidence** of prior acts of discrimination against the parties and against others in the same protected classes was admissible and whether recovery could include past acts where they were part of an ongoing pattern of discrimination.   The *Morgan* Court explicitly held that evidence of prior acts of discrimination – even acts for which remedy is precluded under the statue of limitations – are relevant and admissible to prove discriminatory intent.  536 U.S. at 113, 122 S.Ct. at 2072.

Plaintiff agrees with NHS that "discrete discriminatory acts are not **actionable** if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act."   This aspect of the *Morgan* holding is irrelevant to whether Hassan has raised a valid claim of discrimination, however.  It is but **one aspect** of the holding in *AMTRAK v. Morgan,* 536 U.S. 101 (2002).  NHS misleads the court, however, with its pretense that *Morgan* had nothing more to say on the topic. In fact, however, the Supreme Court went on to state that:

> "The existence of past acts and the employee's prior knowledge of their occurrence, however, **does not bar employees from filing charges about related discrete acts** so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  **Nor does the statute bar an**

> **employee from using the prior acts as background evidence in support of a timely claim."**

*National R.R. Passenger Corp. v. Morgan* 536 U.S. 101, 113, 122 S.Ct. 2061, 2072 (U.S.2002) (emphasis supplied).

Thus, although NHS purports to rely on *Morgan,* it invites the Court to rule directly contrary to these holdings.  NHS would have this court dismiss Hassan's Complaint because *in addition to his timely claim* he alleged prior acts of discrimination.  He raises those acts both as background evidence in support of a timely claim" based upon acts within the statutory period, and as evidence of an ongoing pattern of hostility and discrimination.

This is consistent with the case law, which has long held that treatment of other members of the protected class and of comparators outside the protected class is relevant and admissible in a discrimination case.  *See, e.g., McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817 (evidence that employees of another race were treated differently from the plaintiff under comparable circumstances is "[e]specially relevant" to whether employer's proffered explanation is pretextual); *Becker v. ARCO Chemical Co.,* 207 F.3d 176, 194 n. 8 (3d Cir.2000) ("as a general rule, evidence of a defendant's prior discriminatory treatment of a plaintiff or other employees is relevant and admissible under the Federal Rules of Evidence to establish whether a defendant's employment action against an employee was motivated by invidious discrimination").

> "A plaintiff alleging employment discrimination may challenge the employer's proffered explanation by showing "that the employer treated other, similarly situated persons out of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons." *Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir.1994); *accord Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1214-15 (3d Cir.1995) (holding that "evidence as to [a supervisor's] attitude toward other older employees and the manner in which he treated them" was relevant to whether supervisor "harbored a

> discriminatory attitude against older workers, and if credited, that evidence made
> the existence of an improper motive for the discharge decision more probable.").
> Thus, other acts are admissible under Rule 404(b) in the employment
> discrimination context for the proper purpose of establishing or negating
> discriminatory intent. *E.g., Coletti v. Cudd Pressure Control,* 165 F.3d 767, 776-
> 77 (10th Cir.1999); *Heyne v. Caruso,* 69 F.3d 1475, 1479-80 (9th Cir.1995)."

*Ansell v. Green Acres Contracting Co., Inc.* 347 F.3d 515, 521 (3d Cir.2003).  "Moreover, in

Rule 403 terms, this evidence [of other acts of like discrimination] is highly probative, hence it is

unlikely that any putative prejudice therefrom will be unfair or will outweigh its value." *Hurley*

*v. Atlantic City Police Dept.* 174 F. 3d 95 (3d. Cir. 1999) (citations omitted).

It is beyond argument that most discrimination claims are proved by circumstantial

evidence.

> [This evidence] "typically includes unflattering testimony about the employer's
> history and work practices [which might otherwise be excluded].   In
> discrimination cases, however, such background evidence may be critical for
> jury's assessment of whether a given employer was more likely than not to have
> acted from an unlawful motive. . . . evidence of the nature of [other similar]
> complaints and the defendant's disposition of those complaints was highly
> relevant to the plaintiff's case because "an atmosphere of condoned
> [discrimination] in a workplace increases the likelihood of retaliation for
> complaints in individual cases."

*Glass v. Philadelphia Elec. Co.* 34 F.3d 188, 195 (3d Cir. 1994) (citations omitted).[6]  In *Glass,*

the Third Circuit found reversible error where the trial court excluded evidence of past racial

harassment.

As recently as 2000, the Third Circuit reiterated that  "as a general rule, evidence of a

defendant's prior discriminatory treatment of a plaintiff or **other employees** is relevant and

admissible under the Federal Rules of Evidence to establish whether a defendant's employment

---

[6] These decisions are obviously also applicable to evidence regarding NHS' opposition to
Hassan's application for unemployment benefits on the grounds that he had quit.

action against an employee was motivated by invidious discrimination." *Becker v. ARCO Chemical Co.* 207 F.3d 176, 194, fn. 8 (3d. Cir. 2000)(citations omitted).   Admission of evidence of prior acts of discrimination is proper in those cases, "because of the discriminatory nature of the prior conduct, which in turn tended to show the employer's state of mind or attitude towards members of the protected class." *Becker,* 207 F. 3d at 194.

Where, as here, plaintiff must rely largely on circumstantial evidence, comparison to the employer's treatment of other employees is the *sine qua non* of proof.   Thus, the decision in *Fuentes* stands for the proposition that a plaintiff in an employment discrimination case can survive a summary judgment motion by showing, *inter alia,* "that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons." 32 F.3d at 765(emphasis supplied).

Evidence of hostility to other members of the protected group can be probative of whether nondiscriminatory reasons asserted by the for its actions were "in fact a pretext for discrimination." *Hurley,* 174 F. 3d at 110.  As noted in *Hurley,* "in Rule 403 terms, this evidence is highly probative, hence it is unlikely that any putative prejudice therefrom will be unfair or will outweigh its value." *Id.*   Discriminatory animus on the part of the decision maker is especially relevant to the potential discriminatory abuse of subjective decision-making criteria. *Pitre v. Western Elec. Co., Inc.*, 843 F.2d 1262, 1271-72 (10th Cir. 1998) (past discriminatory attitudes of decision makers, decision makers' involvement with past discrimination, and presence of specific discriminatory incidents all relevant to finding of discrimination).

It is too early to determine whether plaintiff, who is not required to plead every fact in support of his claim,  may be able to demonstrate an ongoing pattern of hostile work environment

sufficient to **recover** for past acts under *Morgan* (as opposed to his clear entitlement to present evidence of those acts to a jury).  His claims for violation of Title VII and the PHRA in his termination, however, are clearly entitled to proceed.  Moreover, his evidence of prior discriminatory acts is clearly admissible and relevant under *Morgan.*  They can not possibly form the basis for dismissal of this Complaint.

NHS's reliance on *Rush* [113 F. 3d at 483] likewise without merit.  *Rush* presented two claims: Plaintiff alleged her employer had failed to train and promote her prior to the statute of limitations cut-off date and she alleged an ongoing pattern of sexual harassment beginning prior to the statute of limitations cut-off date and continuing into the covered period.  *Rush,* 113 F. 3d at 479-480.   The Court explained that the continuing violation theory allows a plaintiff to pursue a Title VII claim for discriminatory conduct that began prior to the filing period "if he can demonstrate that the act is part of an ongoing practice or pattern of discrimination."  113 F. 3d at 481.   The Third Circuit in *Rush* affirmed its prior holding in *West v. Philadelphia Elec. Co.*, 45 F. 3d 744, 54-55 (3d Cir. 1995):

> "to demonstrate a continuing violation, the plaintiff first must show that at least one discriminatory act occurred within the [statutory] period.  Second, the Plaintiff must show that 'the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination' and instead must demonstrate a continuing pattern of discrimination." A plaintiff satisfying these requirements may present evidence and recover damages for the entire continuing violation, and the [statutory] period will not act as a bar."

*Rush*, 113 F. 3d at 481 (quoting *West, supra*).

After reviewing this evidence, the Third Circuit concluded that the District Court was correct when it determined that Rush's sexual harassment claim constituted a continuing violation and that she was properly permitted to present evidence of incidents occurring prior to the limitations period where there were clear violations after that date which constituted a

continuous pattern of harassment.   This was true even though the Plaintiff in *Rush* had filed an earlier discrimination charge which failed to mention harassment that had occurred by that date, where the evidence showed in part that plaintiff blamed herself for the harassment and that she did not realize how pervasive or severe the harassment was until later. 113 F. 3d at 482.

In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061 (2002) the Supreme Court resolved the conflict among the Circuits, rejecting a rule that plaintiff must show that it would not have been reasonable to bring a hostile environment claim earlier in order to avoid the bar of the statute of limitations and allowed recovery for conduct predating the statute under a hostile environment theory.  *Morgan,* 536 U.S. at 106-7, 122 S.Ct. at 2069 (citations omitted).  Even as to such "single occurrence" acts of discrimination, however, the *Morgan* Court held that **plaintiff may use prior discrete acts of discrimination  - - even those outside the statute of limitations  - - as "background evidence in support of a timely claim."** *Morgan*, 536 U.S. at 113, 122 S.Ct. at 2072 (emphasis supplied).  Thus even without a hostile environment claim, prior discriminatory acts of NHS against Hassan and others are admissible in Hassan's case.

In *Morgan,* the Supreme Court distinguished hostile environment claims from claims based upon discrete acts, noting (as did the Third Circuit in *Rush* and *West, supra*) that they are "different in kind from discrete acts. Their very nature involves repeated conduct . . . Such claims are based on the cumulative effect of individual acts." 536 U.S. at 115, 122 S.Ct. at 2073. The Court held that  in order for the charge to be timely, the plaintiff need only file within the applicable statutory period "of **any** act that is part of the hostile work environment." *Id.,* 536 U.S. at 117-18,  122 S.Ct. at 2075 (emphasis supplied).

"Consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."

536 U.S. at 105, 122 S.Ct. at 2068.

These are ultimately evidentiary issues.  Thus, for example, in *Blum v. Council Rock School Dist.,* 2003 WL 1873617, *4 (E.D.Pa. 2003), this Court stated,

"where a plaintiff can **produce evidence** of a 'continuing violation', the 300-day period for filing with the EEOC may be tolled.  To demonstrate a continuing violation, a plaintiff must show that: (1) at least one act occurred within the statutory period; and (2) the prior conduct was not isolated or sporadic, but was part of a continuing pattern of discrimination."

*Id.* at *4, (citing *Rush,* 113 F.3d at 481; *West,* 45 F.3d at 754).

Similarly, in *Cabral v. Philadelphia Coca Cola Bottling Co.*, where most of the conduct complained of by plaintiff in support of a hostile work environment claim occurred outside the 300 day filing period, the Court held that because the acts were part of the same hostile environment and at least one act fell within the time period, plaintiff could proceed regarding all alleged acts. 2003 WL 1421297, *9 (E.D.Pa. 2003).  *Accord, Vu v. Taystee Baking Co., Inc.* 2002 WL 32355608, *1 (E.D.Pa. 2002) (Title VII plaintiff may maintain a cause of action for a hostile work environment for acts occurring before limitations period where at least one occurred within the 300-day time period).

In *Norman v. University of Pittsburgh,* 2002 WL 32194730, *13 (W.D.Pa. 2002), the Western District Court noted that a hostile environment claim is based on the cumulative effect of separate acts occurring over days or perhaps years, and held:  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at *13,

citing *Morgan*. *Norman* further states, "it is 'settled law' in this Circuit that claims of hostile environment must be considered in light of the sum total of abuse over time, not by looking at each incident of harassment in isolation." *Id.,* citing *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 155 (3d Cir.1999).

In order to establish an ongoing violation theory, Plaintiff must: (1) demonstrate that at least one act occurred within the filing period; and, (2) must establish that the harassment is more than the occurrence of isolated or sporadic acts of intentional discrimination. .*Mertz v. Federal Express* 1999 WL 993992 (E.D.Pa.1999)(citing *West, supra*). "[A] time gap between the periods of harassment . . . is not dispositive of a lack of continuity." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Once the Plaintiff has met the requirements of an ongoing violation theory, she may "present evidence and recover damages for the entire continuing violation period." *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481 (3d Cir.1997).

This is clearly a fact intensive inquiry, for which plaintiff laid the groundwork in his Complaint by reference to his own earlier harassment and that of others. It is much too early in the litigation for this court to rule that he cannot possibly prove this claim. Assuming Plaintiff's allegations of an ongoing pattern of discrimination are true, as the court must proved, he clearly can both prove and recover for the entire pattern of discrimination.

**IV.     CONCLUSION**

For all of the foregoing reasons, Defendant NHS' Motion to Dismiss under Rule 12(b)(6) should be denied.  To the extent the court believes any of his claims are not adequately supported by the pleadings, Hassan requests leave to amend his Complaint to state additional facts which will meet all of Defendant's challenges.

/s/ND870_____
Nancy C. DeMis, Esquire
GALLAGHER, SCHOENFELD, SURKIN,
        CHUPEIN & DEMIS, PC
25 West Second Street
Media, PA 19063
*Counsel for Plaintiff Elsheik M. Hassan*

## CERTIFICATE OF SERVICE

I, Nancy C. DeMis, Esquire, hereby certify that I caused true and correct copies of the foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, WITH PROPOSED ORDER to be filed via the court's electronic filing system, from which it is immediately available and to be served via first class mail, postage prepaid, to the following persons on the date indicated below:

> Patrick G. Murphy, Esq.
> Kelley and Murphy
> 925 Harvest Drive, Suite 160
> Blue Bell, PA  19422
> Attorney for Defendant
> Northwestern Human Services

Date:   November 8, 2006          /s/ND870
                                  NANCY C. DEMIS
                                  Attorney ID No. PA 58897
                                  GALLAGHER, SCHOENFELD, SURKIN
                                       CHUPEIN & DEMIS, P.C.
                                  25 West Second Street
                                  P.O. Box 900
                                  Media, PA 19063
                                  Telephone:  (610) 565-4600
                                  Facsimile: (610) 566-8257
                                  *Attorneys for Plaintiff*